Argued May 31, affirmed in part and remanded in part July 30,
reconsideration denied September 6, petition for review denied
October 16, 1979

## STATE OF OREGON,
*Appellant-Cross-Respondent,*

*v.*

## LIONETTI ANITA HAYNES,
*Respondent-Cross-Appellant.*

(No. 78-1763, CA 12018)

597 P2d 1297

Brian R. Barnes, Assistant District Attorney, Eugene, argued the cause for appellant-cross-respondent. With him on the brief was J. Pat Horton, District Attorney, Eugene.

Douglas L. Melevin, Eugene, argued the cause and filed the brief for respondent-cross- appellant.

Before Schwab, Chief Judge, Thornton, Buttler, Joseph, Judges, and Peterson, Judge Pro Tempore.

JOSEPH, J.

## JOSEPH, J.

Defendant was charged with murder. She moved for a pre-trial omnibus hearing to determine "the voluntariness and admissibility of statements allegedly made by the defendant to police officers or other persons after the alleged act set out in the indictment." The trial court ruled some statements admissible and others inadmissible. The state appeals, and defendant cross-appeals. There has not yet been a trial on the charge.

John Bruno and Charles Haynes, defendant's husband, were arrested on March 10 and 11, respectively, for the murder of Pamela Bruno. After she learned of her husband's arrest, defendant contacted Detective Davis of the Eugene Police Department—a family friend—and asked that he accompany her to the Springfield police station, where her husband was being held. Davis obliged. Defendant spent several hours discussing Charles Haynes' arrest with Springfield officers. She claimed he could not have been involved in the homicide because she and he were together at the time it allegedly occurred. She returned to her home.

The next day (March 12) John Bruno and Charles Haynes were allowed to talk to each other for the first time since their arrests. They had both previously made confessions in which defendant was not mentioned. When they got together, however, they implicated defendant in the murder. At approximately 5 p.m. that day, Detective Davis was sent to bring defendant in for questioning. He found her at her mother's residence and asked her to go the Springfield police station with him. On the way, as Davis drove and defendant sat in the back seat with another officer, Davis advised her of her *Miranda* rights. She acknowledged that she understood her rights, but asked why Davis felt it necessary to so advise her. As he recalled, he told her

"[t]here could possibly be some conversation [at the station] that could possibly implicate him [Charles Haynes] and her in the murder, and, if so, I wanted her aware of her rights."

When defendant arrived at the station, Detectives Bond and Smith took her into an office for interrogation. Davis told them he had advised defendant of her rights. The questioning lasted no more than 10 minutes. Defendant denied that her husband committed the murder, and when the detectives suggested she might have been involved herself, she asked, "Do I have to talk to you anymore?  Am I free to go?" The detectives told defendant she was under arrest, but they immediately ceased questioning her and left the room.

As Bond and Smith went out the door, defendant saw Davis sitting in the hall. She asked to speak with him. Defendant asked him, "What did they say I did?" Davis told her that Bruno and her husband said that she had been involved in the murder. She asked if either of them had taken a lie detector test. Davis told her Bruno had taken a test and had failed. She asked what would happen if she took a lie detector test herself. He told her that the results could not be used against her. She asked for the test. An Oregon State Police polygraph examiner administered it. Before beginning, he advised defendant again of her *Miranda* rights. Defendant was cooperative throughout the polygraph examination.

In the meantime, Detectives Bond and Smith went with John Bruno and Charles Haynes to the Haynes' residence. There they videotaped a re-enactment of the murder and the subsequent dismemberment, with Bond portraying the victim and Haynes and Bruno portraying themselves and defendant.

When she finished the lie detector test, defendant asked to talk to Detective Davis again. They met at approximately 10:30 p.m. Defendant asked the results of the polygraph, and Davis told her she had failed. He

brought the examiner in to explain the results. Defendant then talked with Davis for approximately half an hour. When she saw Bond again, she asked to speak with him, too. The three were together about an hour, during which time defendant was told of the videotaped re-enactment. She asked to see the tape.

With Detectives Bond and Davis present, defendant viewed the tape for the first time, beginning about midnight. It lasted about a half hour. While watching, defendant remarked that she could not recall the incident. She also remarked how "morbid" and "brutal" it was.

After the first showing, defendant asked if she could watch the tape again with her husband. The second viewing began about 1 a.m., with Charles Haynes and Davis and Bond present. During and after the second showing, defendant and Charles Haynes talked to one another. Davis recounted their conversation and other statements of defendant as follows:

"There was a large amount of conversation between the Defendant and her husband and in that she would ask Charles, 'How could I do that?' This was referring to when the videotape showed Charles taking her place, come in and stab Pam. And she would make statements, 'I must have been crazy. Charles, I couldn't cut up a human being, could I?' And this was referring to ***. This was referring to when Pam was carried into the bathroom and butchered. And Charles would answer, 'Honey, we were—it was all of us, not just you. We did it.' And Anita would make statements, 'But how could we? That is crazy.' And Charles would reply, 'We were all crazy at the time. We had to have been.' Anita would respond, 'Yes, but you and John were drunk and I wasn't. I must have engineered the whole thing.' And Charles would reply to her, 'We all did it.' And Anita would make a statement, 'But I stabbed her first.' And Charles would answer, 'Honey, we all did it, all three of us.' And Anita would say, 'But you seen it, Charles. You were both drunk. I was sober. What's going to happen to us? We wouldn't be safe around our kids.

[325]

We should never be let out. We could hurt our own kids next.' And Charles attempted to get Anita to remember more of what happened, and he would tell her, 'Try to remember it. It will make you feel better after you get it out.' And she would answer, 'I am trying, Charles. I know we did it. It's in the back of my mind but it won't come out. I just can't face it.' And then she would ask him, 'What's going to happen to our kids? Who is going to take care of them? We can never be around them again. We might kill them next.' And then after the video, Anita asked me, she said, 'Davis, I want my kids to stay with my brother Joe. He's the only one that can bring them up right. Could you make sure my brother Joe gets our kids? I don't want my folks to have them. They are too old. Charles' parents are too old. I want them to stay with Joe. He's the only one that can bring them up right.' And she said her brother Richard, he drinks too much, 'I don't want him to have the, to have the kids.' And she asked her husband Charles, 'You want the kids to go to Joe, don't you?' And Charles would reply that he did. And Anita said, 'Charles, we must be crazy like Brudos and Marquette. How could we do something as morbid as that?' And Charles would reply, 'I don't know, honey. We did it. We were all drinking.' And Anita would say, 'But she wasn't,' 'You and John were drunk, but I wasn't. And why can't I remember? I know I did it because you said I did and you wouldn't lie.' And Charles would tell her, 'It was so awful you are trying to put it in the back of your mind. It will make you feel better if you just come out and talk about it.' She would tell him, Anita would say, 'I am trying, but I can't say it. I know we did it.' Charles asked her on one occasion to just say she did it, 'Just say 'I killed Pam.' And Anita said she just couldn't do it. Charles told her, 'You've got to baby. You can't keep it inside you. It will eat you up. I feel better since I have admitted to it. It took a load off my mind. Honey, last night was the first night I have been able to sleep since we did it."

After Charles Haynes was taken back to his cell, defendant was asked if she was willing to help locate other parts of the victim's body. She agreed to do so.

She, Bond, Davis and another officer drove around for an hour, but they found nothing.

When they returned to the station, Detective Smith asked defendant if she wanted an attorney. She replied emphatically that she did not need "any damn attorney." Smith testified that she remained cooperative and that

> "She appeared to be in control of her faculties. She was responsive. Quite frankly, she was very much in command of herself and was somewhat the aggressor, as far as any discussions we had."

During the interrogation, defendant recalled fragments of incriminating information, but said she could not remember the incident totally. At one point in his attempt to jog her memory, Smith utilized a large sheet of paper on which he had written the various details defendant did remember. His questioning ended when defendant was taken to be arraigned.

After the arraignment (but prior to the appointment of an attorney), defendant was taken back to the Springfield police station. She again asked to talk to Davis. Bond asked if defendant would be willing to speak with the victim's mother. She said she would. Defendant told the mother that she knew she was responsible for Pam Bruno's death and that she got flashbacks about her death but could not force herself to talk about it. She said if the victim's mother would return in an hour, she would tell her where the rest of her daughter's body was. That meeting never took place.

The trial court's order stated in material part:

> "Based on the evidence introduced in the Omnibus hearing, it appears clearly that Defendant was aware of her rights and was informed of her rights prior to any custodial interrogation. Further, that Defendant knowingly and voluntarily waived any right to remain silent. That although at one point Defendant indicated a desire to no longer talk to the officers, she reopened discussions herself and thereafter voluntarily and knowingly engaged in conversations with the

officers. Additionally Defendant did not request an attorney but waived such right knowingly. Defendant did affirmatively adopt statements made by co-defendant, husband, Charles Haynes. The Defendant requested presence of husband and knowingly and voluntarily made statements in response to husband's statements and also made statements, knowingly and voluntarily, on her own and not in response to her husband. There is no possible expectation of privacy of conversation (nor request) between the Defendant and her husband.

"Based on the foregoing, the following conclusions have been reached:

"(A) The following statements are admissible, unless objectionable on grounds of relevance, etc:

"(1) Statements made prior to March 12, 1978.

"(2) Statements made on March 12 prior to arrest.

"(3) Statements made after the arrest except those directly related to the taking of a polygraph or the results of a polygraph.

"(4) Statements made after arraignment unless made in response to direct inquiry by an officer.

"(B) The video tapes and evidence related directly to the showing of the video tapes are not admissible. Statements made by the Defendant in response to statements made by the co-defendant, husband, Charles Haynes are admissible."

The state argues the trial court erred in ruling the video tape and "evidence related directly to the showing of the video tape" inadmissible. Defendant contends that the court erred in ruling admissible her statements "in response to" statements of her husband. Although the trial court's order did not specifically determine the admissibility of Charles Haynes' statements, both parties treat those statements as in issue, too, the state of course arguing for their admissibility and defendant against.

Because of critical inadequacies and ambiguities in the trial court's order, we are unable to resolve the issues. To put it differently, we cannot review the critical portions of the order because we do not

understand them. The trial court ruled the video tape and "evidence related directly to showing of the video tape" inadmissible, but did not state the basis of that ruling. There was no mention of the video tape in defendant's motion. The tape would, of course, be hearsay if offered for the truth of the matters asserted therein, but the state contends it was admissible for another purpose. It argues the record clearly shows that some of defendant's statements were made directly in response to the video tape and others in response to Charles Haynes' comments about the tape.

We agree that many of defendant's statements could not make sense to a juror who was unaware of the video tape, but that does not mean both the tape and defendant's conduct in response to it would necessarily be admissible. The video tape did, however, contain statements and declaratory acts of Charles Haynes and others, and defendant might have affirmatively adopted some of those statements as well as some of her husband's live comments.

ORS 136.425(2) provides:

> "Evidence of a defendant's conduct in relation to a declaration or act of another, in the presence and within the observation of defendant, cannot be given when the defendant's conduct occurred while he was in the custody of a peace officer unless the defendant's conduct affirmatively indicated his belief in the truth of the matter stated or implied in the declaration or act of the other person."

The court may have found defendant did not affirmatively indicate her belief in the truth of any statements or acts on the tape. We do not know. The court purported to distinguish between defendant's responses to her husband's comments and "evidence related directly to showing of the video tape." That demarcation is not apparent to us. If the court intended to distinguish between responses to live statements and responses to the video tape, we do not understand the basis for that distinction. Perhaps the

[329]

court found something else objectionable about the tape, but it offered no explanation of its ruling.

Furthermore, the court expressly found that defendant affirmatively indicated her belief in the truth of some statements of Charles Haynes, but it did not specify which. The record, recited above, could not support a finding that she affirmatively indicated her belief in the truth of all his statements to which she responded. The court ruled, however, that all her statements 'in response to' his were admissible. Presumably, the statements responded to would also be admissible in order to give content to the responses, but the court did not directly address that question.

Although it is perhaps not immediately apparent, ORS 136.425(2), *supra*, is intended primarily to prevent the admission of statements of persons other than defendant where defendant's responses were silence or other conduct ambiguous in the circumstances. If the court intended to admit every statement of Charles Haynes to which defendant made some response, its ruling ran afoul of that statute. But the order is not clear on that point.

We conclude that the order must be remanded to the trial court for clarification of conclusion (B). *See State v. Johnson/Imel*, 16 Or App 560, 519 P2d 1053, *rev den* (1974).

Defendant raises two other issues in her cross-appeal. She argues the court erred in failing to rule inadmissible the testimony of Detective Smith concerning statements made to him by defendant, because his failure to produce the chart he used in interrogating her was a violation of ORS 135.815(2). That contention was not raised below, and we will not consider it on appeal.

██ She also argues the court erred in "not excluding hearsay testimony of defendant's husband pursuant to the marital privilege provided in ORS 136.655 and 44.040(1)(a)." As noted above, the court did not

expressly rule on the admissibility of evidence concerning statements of Charles Haynes, but a ruling of admissibility of some such evidence was implicit in the court's order. The state concedes that Charles Haynes' statements on the video tape would not be admissible unless "adopted" by defendant. If she did affirmatively express a belief in the truth of any such statements, the admission of the taped statements to give content to defendant's own adoptive admissions would not offend ORS 44.040(1)(a); nor would evidence of the conversation between defendant and her husband, if otherwise admissible, contravene the confidential communication privilege, because it was held in the presence of other persons. *Pugsley v. Smyth*, 98 Or 448, 194 P 686 (1921); *see also State v. Suttles*, 37 Or App 695, 588 P2d 635 (1978), *rev'd* on other grounds, 287 Or 15, 597 P2d 786 (1979).

Affirmed in part; remanded in part.