Argued and submitted June 23, affirmed November 10, 1980

## STATE OF OREGON,
*Appellant, Cross-Respondent,*

*v.*

## LIONETTI ANITA HAYNES,
*Respondent, Cross-Appellant.*

(No. 78-1763, CA 16304)

619 P2d 889

Brian R. Barnes, Assistant District Attorney, Eugene, argued the cause for appellant, cross-respondent. With him on the briefs was J. Pat Horton, District Attorney for Lane County, Eugene.

Douglas L. Melevin, Eugene, argued the cause and filed the briefs for respondent, cross-appellant.

Before Joseph, Presiding Judge, and Warden and Warren, Judges.

JOSEPH, P.J.

**JOSEPH, P.J.**

This is the second appeal in this murder case. *See State v. Haynes,* 41 Or App 321, 597 P2d 1297, *rev den* (1979). There has not yet been a trial on the merits. *See Haynes v. Burks,* 290 Or 75, 619 P2d 632 (1980). (By order of the Supreme Court the trial court file, record, and transcript necessary for consideration of this appeal were in that court for a period of 90 days from July 30, 1980, to October 27, 1980. One of the issues presented in that habeas corpus proceeding was whether defendant was entitled to have the charges dismissed.)

In a pre-trial omnibus hearing the trial court originally held certain of defendant's statements admissible and others inadmissible. That order is set out in the margin.[1] On the prior appeal by the state we remanded for

---

[1]

"Based on the evidence introduced in the Omnibus hearing, it appears clearly that Defendant was aware of her rights and was informed of her rights prior to any custodial interrogation. Further, that Defendant knowingly and voluntarily waived any right to remain silent. That although at one point Defendant indicated a desire to no longer talk to the officers, she reopened discussions herself and thereafter voluntarily and knowingly engaged in conversations with the officers. Additionally Defendant did not request an attorney but waived such right knowingly. Defendant did affirmatively adopt statements made by co-defendant, husband, Charles Haynes. The Defendant requested presence of husband and knowingly and voluntarily made statements in response to husband's statements and also made statements, knowingly and voluntarily, on her own and not in response to her husband. There is no possible expectation of privacy of conversation (nor request) between the Defendant and her husband.

"Based on the foregoing, the following conclusions have been reached:

"(A) The following statements are admissible, unless objectionable on grounds of relevance, etc:

"(1) Statements made prior to March 12, 1978.

"(2) Statements made on March 12 prior to arrest.

"(3) Statements made after the arrest except those directly related to the taking of a polygraph or the results of a polygraph.

"(4) Statements made after arraignment unless made in response to direct inquiry by an officer.

"(B) The video tapes and evidence related directly to the showing of the video tapes are not admissible. Statements made by the Defendant in response to statements made by the co-defendant, husband, Charles Haynes are admissible."

clarification because part of that order, relating to a video tape re-enactment of the murder in which her husband portrayed defendant, was unclear. We stated:

"*** The trial court ruled the video tape and 'evidence related directly to showing of the video tape' inadmissible, but did not state the basis of that ruling. There was no mention of the video tape in defendant's motion. The tape would, of course, be hearsay if offered for the truth of the matters asserted therein, but the state contends it was admissible for another purpose. It argues the record clearly shows that some of defendant's statements were made directly in response to the video tape and others in response to Charles Haynes' comments about the tape.

"We agree that many of defendant's statements could not make sense to a juror who was unaware of the video tape, but that does not mean both the tape and defendant's conduct in response to it would necessarily be admissible. The video tape did, however, contain statements and declaratory acts of Charles Haynes and others, and defendant might have affirmatively adopted some of those statements as well as some of her husband's live comments.

"ORS 136.425(2) provides:

" 'Evidence of a defendant's conduct in relation to a declaration or act of another, in the presence and within the observation of defendant, cannot be given when the defendant's conduct occurred while he was in the custody of a peace officer unless the defendant's conduct affirmatively indicated his belief in the truth of the matter stated or implied in the declaration or act of the other person.'

"The court may have found defendant did not affirmatively indicate her belief in the truth of any statements or acts on the tape. We do not know. The court purported to distinguish between defendant's responses to her husband's comments and 'evidence related directly to showing of the video tape.' That demarcation is not apparent to us. If the court intended to distinguish between responses to live statements and responses to the video tape, we do not understand the basis for that distinction. Perhaps the court found something else objectionable about the tape, but it offered no explanation of its ruling.

"Furthermore, the court expressly found that defendant affirmatively indicated her belief in the truth of some statements of Charles Haynes, but it did not specify which. The record, recited above, could not support a finding that she affirmatively indicated her belief in the truth of all his

statements to which she responded. The court ruled, however, that all her statements 'in response to' his were admissible. Presumably, the statements responded to would also be admissible in order to give content to the responses, but the court did not directly address that question." 41 Or App at 329-330.

On remand, following a hearing, the court issued an amended order which provides:

"Based on the evidence introduced in the omnibus hearing it appears that during the course of the conversation between the defendant and her husband, Charles, the defendant made statements constituting admissions which were made freely and voluntarily and with no expectation of privacy. It is concluded that such statements are admissible. Further during the course of that conversation, the defendant affirmatively indicated her belief in the truth of certain matters stated by her husband. Such affirmative statements are admissible within the context of ORS 136.425(2). Additionally, during the course of this conversation, a videotape reenactment of the events leading to the death of Mrs. Bruno was twice reviewed by the defendant with her husband present. The videotape was reenacted with the defendant's husband participating along with another defendant, Bruno and with the assistance of some Springfield detectives. As the videotape was shown, the defendant made some affirmative statements in regard to segments of the videotape, but on other occasions made equivocal or negative statements. Since the videotape is continuous and intended to portray a complete reenactment of the events, and there were times that the defendant did not indicate an affirmative belief in what was shown and there would be no practical way to separate portions of the videotape without prejudice to the defendant (unlike a conversation reported in segments), the videotape is not admissible.

"NOW, THEREFORE, the Order entered the 11th day of September, 1979, is hereby amended as follows:

"(B) The videotapes and any evidence relating to the making of the videotapes or the showing of such tapes during the conversation between the defendant and her husband, Charles Haynes, are not admissible. Statements constituting an admission made during the conversation between the defendant and her husband and which do not directly refer to the videotape are admissible. Statements affirmatively indicating defendant's belief in the truth of

matters stated by her husband during the course of the conversation are admissible."

The state appeals from the amended order, arguing that the trial court erred in ruling inadmissible the video tape shown to defendant. It maintains that that portion of the video tape affirmatively adopted by defendant should be admissible. Defendant cross-appealed pursuant to ORS 138.040,[2] assigning as error the trial court's failure to exclude certain testimony because of a claimed violation of the discovery statutes. ORS 135.805-135.873.

The evidence of the conversations at the showing of the video tape was as follows:

"After the first showing, defendant asked if she could watch the tape again with her husband. The second viewing began about 1 a.m., with Charles Haynes and [officers] Davis and Bond present. During and after the second showing, defendant and Charles Haynes talked to one another. [Officer] Davis recounted their conversation and other statements of defendant as follows:

" 'There was a large amount of conversation between the Defendant and her husband and in that she would ask Charles, "How could I do that?" This was referring to when the videotape showed Charles taking her place, come in and stab Pam. And she would make statements, "I must have been crazy. Charles, I couldn't cut up a human being, could I?" And this was referring to ***. This was referring to when Pam was carried into the bathroom and butchered. And Charles would answer, "Honey, we were — it was all of us, not just you. We did it." And Anita would make statements, "But how could we? That is crazy." And Charles would reply, "We were all crazy at the time. We had to have been." Anita would respond, "Yes, but you and John were drunk and I wasn't. I must have engineered the whole thing." And Charles would reply to her, "We all did it." And Anita would make a statement, "But I stabbed her first." And Charles would answer, "Honey, we all did it, all three of us." And Anita would say, "But you seen it, Charles. You were both drunk. I was sober. What's going to happen to us? We wouldn't be safe round our kids. We should never be let out. We could hurt our own kids next." And Charles attempted to get Anita to remember more of what happened, and he would tell her, "Try to remember it. It will make you feel better after you get it out." And she

---

[2] *Not* ORS 138.060 as stated in *Haynes v. Burks, supra,* 290 Or at 86.

would answer, "I am trying, Charles. I know we did it. It's in the back of my mind but it won't come out. I just can't face it." And then she would ask him, "What's going to happen to our kids? Who is going to take care of them? We can never be around them again. We might kill them next." And then after the video, Anita asked me, she said, "Davis, I want my kids to stay with my brother Joe. He's the only one that can bring them up right. Could you make sure my brother Joe gets our kids? I don't want my folks to have them. They are too old. Charles' parents are too old. I want them to stay with Joe. He's the only one that can bring them up right." And she said her brother Richard, he drinks too much, "I don't want him to have the, to have the kids." And she asked her husband Charles, "You want the kids to go to Joe, don't you?" And Charles would reply that he did. And Anita said, "Charles, we must be crazy like Brudos and Marquette. How could we do something as morbid as that?" And Charles would reply, "I don't know, honey. We did it. We were all drinking." And Anita would say, "But she wasn't," "You and John were drunk, but I wasn't. And why can't I remember? I know I did it because you said I did and you wouldn't lie." And Charles would tell her, "It was so awful you are trying to to put it in the back of your mind. It will make you feel better if you just come out and talk about it." She would tell him, Anita would say, "I am trying, but I can't say it. I know we did it." Charles asked her on one occasion to just say she did it, "Just say 'I killed Pam.' " And Anita said she just couldn't do it. Charles told her, "You've got to baby. You can't keep it inside you. It will eat you up. I feel better since I have admitted to it. It took a load off my mind. Honey, last night was the first night I have been able to sleep since we did it." ' " 41 Or App at 325-326.

The trial court expressly found that during the showing of the video tape reenactment defendant at times expressed both affirmative and equivocal statements in response to the video tape. It ruled that because the tape portrayed a continuous and complete reenactment of the murder, the tape and any evidence related to its making or its showing could not be admitted without prejudice to defendant.

In its amended order the trial court did not make specific findings on which of defendant's statements were affirmative or equivocal. During the hearing on remand, the court stated:

"*** [I]t would be impossible to specifically set forth every single one of the statements because it is a fairly lengthy statement. I will give you some examples that I took. I read over *** the transcript and generalized statements were such that it didn't seem that there were really any admissions during the first showing. There were some equivocal statements on the second showing ***, 'How could I do that?' 'I must have been crazy.' 'Charles, I couldn't cut up a human being, could I?' Now, that, to me, is equivocal. On [another] page ***, however, it is fairly affirmative in answer to her husband, 'I am trying, Charles. I know we did it. It's in the back of my mind but it won't come out. I just can't face it.' ***"

The state argues that while defendant made equivocal statements during the portrayal of the stabbing and dismemberment, she made affirmative statements after that portrayal which acknowledged her involvement in what had just been re-enacted. It maintains that whatever her previous statements, when defendant said "I must have engineered the whole thing.", "But you seen it.", and "I know we did it.", she affirmatively acknowledged the *re-enactment* shown in the film.

We understand the state's position to be that without viewing the video tape, the jury would not understand what defendant and her husband were referring to in their use of the indefinite pronoun "it," as, for example, in defendant's statement, "But you *seen it.* " (Emphasis added.) The state apparently claims that by such statements in response to her husband, defendant affirmatively acknowledged all that had previously transpired on the video tape, and that the video tape, would, therefore, be admissible under ORS 136.425(2). We are impressed that the state does not understand the court's amended order. It assumes, incorrectly, that the court ruled admissible statements made in response to scenes on the tapes. What *was* held admissible were admissions made by defendant in *conversation with her husband* and statements affirmatively adopting as true things *her husband said* in that conversation.

■ The only clear reference in the evidence relating defendant's responses to the events as depicted on the video tape was when defendant asked her husband "How could I

do that." She was referring to the video tape having showed her husband portraying her and stabbing the victim. When defendant said "I must have been crazy. Charles, I couldn't cut up a human being, could I?," that was referring to when the victim was carried into the bathroom and butchered. The trial court found those statements to be equivocal, and the record supports that conclusion.

None of defendant's other statements related to a particular segment of the video tape. The trial court did not find that by employing the term "it" while conversing with her husband, the defendant affirmatively adopted any portions of the video tape which had previously been seen by defendant, and expressly did find that those of defendant's statements that did refer to the video tape were equivocal and therefore did not meet the statutory requirements for adoptive admissions. We affirm the trial court's amended order.

Defendant raises one issue in her cross-appeal. She argues that the court erred in failing to rule inadmissible the testimony of Detective Smith concerning statements made to him by her, because the state's failure to produce the chart he used in interrogating her was a violation of ORS 135.815(2).

During the interrogation of defendant, the detective, in an attempt to jog her memory, used a large sheet of paper on which he wrote the various details defendant could remember. Detective Smith testified that he recorded "elements" of the events which defendant could recall, not with her exact words, but a brief paraphrase of her statements. His testimony included:

"The elements that I had written down were that she could recall her husband making love to Pam Bruno. She could recall seeing John at the residence. She could recall getting angry and observing her husband engaged in sexual activity with Pam. She could also — made the statement, 'I know that I killed Pam, that I started it and I engineered the whole thing.' * * *

"She could recall seeing blood and she could also recall that John was the one that tied Pam up and she knew that he was present, John was present."

He further testified that he prepared his report from memory and by utilizing the chart. He had no other notes of the interrogation. The chart was destroyed after Detective Smith finished his report because he believed it was no longer needed. He could not recall the exact phrases he recorded on the chart or their sequence.

In the original pre-trial omnibus hearing, defendant did not object to Detective Smith's testimony on the grounds of a discovery violation. She then argued only that destruction of the chart was "tampering with physical evidence" in violation of ORS 162.295. For that reason we declined to address the discovery issue in our previous opinion. At the remand hearing defendant raised her objection to his testimony on the ground of a discovery violation. Both parties then had an opportunity to address the issue.

The trial court entered an order denying defendant's motion to exclude Detective Smith's testimony, first, because her motion was untimely. Considering the merits, however, the court concluded that the chart was discoverable under ORS 135.815(2) as a "memoranda [*sic*] of any oral statement made by the defendant," but went on to say that Detective Smith's testimony would not be excluded because defendant had not shown any prejudice:

> "Since the sheet is no longer available as having been destroyed, what sanction should the Court apply? My initial ruling, without benefit of a complete review, was to refuse to allow Detective Smith to testify. Upon a more thorough review of the testimony and the law, I am now of the opinion that defendant's motion is to be denied and Detective Smith permitted to testify.
>
> "The reasons for this conclusion are that the information from the sheet has been incorporated into the report of Detective Smith; that the statements of the defendant were not precisely recorded but paraphrased on the sheet; that Detective Smith testified he recalls the items recorded, but not in the exact order or in the words as written; that defendant has been made aware of the entire course of the interrogation and the statements made; and that the defendant has shown no prejudice in the preparation for trial or presentation of evidence by not having the sheet."

We need not decide the issue of timeliness, because the court was in error in concluding that the sheet was discoverable. *See State v. Morrison,* 33 Or App 9, 575 P2d 988 (1978).

Affirmed.[3]

---

[3] Judge Tanzer, specially concurring in *Haynes v. Burks, supra,* 290 Or at 98, said:

"I assume that this case will be tried *if and when* the Court of Appeals decides the appeal." (Emphasis supplied.)

This being "when," we join in Judge Tanzer's assumption. We also assume that, in the event either party chooses to petition the Supreme Court for review of this decision, that court will handle the matter with more than its customary dispatch. *See* Tongue, J., concurring in *Haynes v. Burks, supra,* 290 Or at 98.