Argued and submitted November 28, 1994, conviction for manslaughter reversed and remanded for new trial; conviction for unlawful use of a weapon affirmed and remanded for resentencing March 22, appellant's motion for reconsideration filed March 24 allowed by opinion May 24, 1995
See 134 Or App 501 (1995)

## STATE OF OREGON,
*Respondent,*

*v.*

## MICHAEL LeWAYNE TAYLOR,
*Appellant.*

(C9212-37586; CA A81845)

892 P2d 697

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. With her on the brief was Sally L. Avera, Public Defender.

Ann F. Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge,* and De Muniz and Leeson, Judges.

De MUNIZ, J.

---

* Riggs, P. J., *vice* Rossman, P. J., retired.

## De MUNIZ, J.

Defendant appeals his conviction and sentence for manslaughter in the first degree.[1] ORS 163.118. We reverse and remand.

Defendant and co-defendant Rasheid McCallister were indicted for murder after Jeffrey Thompson died from wounds sustained in a gang-related shooting. To fully understand the facts surrounding the shooting, it is necessary to know something of the gang culture in Portland. Two experts provided that background. Their testimony depicted an unbreakable circle of attack and retaliation. Gangs arrived in Portland in 1986. They are loosely organized and may, or may not, have a leader. All gang members know the most important members of rival gangs. Gangs are divided into sets, with many Crips sets and many Bloods sets. Sets take their name from the neighborhood or from areas in Los Angeles or Compton, California. Gang members are those who have been "mixed in," that is, ritually assaulted by other members of the set. Gang-related persons are those who associate with gang members, but have not been initiated. Defendant does not claim to belong to a set of the Bloods, but most of his associates are Bloods. McCallister belongs to a set of the Bloods known as the Woodlawn Park Bloods.

Association with a gang is often simply a geographic factor, and a person may wear the color of the neighborhood for self-protection or to make life easier. The police identify as gangs any group of people who are always involved in criminal activity. However, not all gang youth engage in crime, and a gang-related youth may be mistaken for a gang member. Although a few hundred persons are initiated gang members, not all of them sell drugs or will shoot someone.

Respect is essential in the gang culture. Respect is gained by doing something seen by the others as showing loyalty or being "down for the set." Respect may be gained by violent acts. "Dissing" someone, that is, showing disrespect, is the major insult. If a gang member is shown disrespect, the member must retaliate or lose respect. Disrespect may result

---

[1] Defendant does not challenge his conviction for unlawful use of a weapon. ORS 166.220.

from someone shooting at a car, or it might involve a perceived slight, such as a hard look or waving the other gang's color. Those who are at the apex of a gang, such as those willing to sell drugs, also might be a target for another gang. Attacking those at the top results in better standing. Gang members generally do not go to the police when they are threatened by another gang, both because the gang mystique requires that each set handle its own problems and also because going to the police would put one's family at risk.

In the days and weeks before the shooting of Thompson, family members and friends had told both defendant and McCallister about death threats to them from various Crips. Both men have been shot before and both took the threats seriously.

Thompson was a member of the Kirby Block Crips. His death arose from events starting near midnight on December 13, 1992. Thompson and LaRome Ollison, who was also a member of the Kirby Block Crips, were riding in Thompson's red Buick with two sisters, Dondra and Kesha Lawson. The sisters associate with Crips members. Ollison testified that he and Thompson were out "banging," that is, looking for fights with members of the opposite gang, rather than "chilling," which means staying out of the fray. Defendant and McCallister were sitting in a Cadillac at a convenience store in Northeast Portland at the corner of Albina and Holman. As Thompson and Ollison drove by the store, they saw the Cadillac and recognized defendant and McCallister talking to Bloods. Ollison said they should go scare the people but Thompson said, no, because the others might have a "strap," meaning a gun. Thompson then said that they should get his gun at his house, which was on Holman street about a block from the store. Thompson parked the car in front of the house and went inside for his gun. The other three stayed in the car.

As Thompson came out of his house, the Cadillac drove down the street and then drove back. Ollison and two independent witnesses testified that they saw guns or muzzle flashes from the Cadillac and heard the sound of gun fire coming from it as it drove past the Buick. Defendant's expert testified that the witnesses could have seen the reflection of muzzle-fire from a gun pointed at the Cadillac, not the actual

muzzle-fire. The police later did not find bullet casings or fragments on the street or surrounding area.[2] There were no bullet holes in the driver's side of the Buick, and no casings were found in the Cadillac. Thompson was not hit, and he shot at the Cadillac. There was evidence that three bullets hit the Cadillac.

After the shooting, Thompson wanted to chase the Cadillac, but decided not to. Instead, the group went to Siretta Hawkins' house on Commercial Street, where they stayed about an hour. Thompson told Dondra that he had only one bullet left, and that he was not going to take the gun into the house. As the group was leaving Hawkins' house, defendant and McCallister drove by, this time in a brown Buick. Thompson's car was parked against the flow of traffic. Thus, the cars were facing the same direction, but on opposite sides of the street. Thompson's car was between him and the brown Buick. Someone yelled, "Die, Blood"[3] and there were gunshots.

Ollison testified that he ran for cover and saw Thompson by the driver's door of his car. Thompson was holding a gun, but Ollison did not see him fire it. Dondra testified that she knew that Thompson did not fire, because he had said that he had only one bullet left. Kesha believed that Thompson probably fired back once.

Thompson was found lying between the sidewalk and his car near the open driver's door. Ollison grabbed the gun and gave it to Hawkins' sister, who took the gun into Hawkins' house. The gun was never recovered. Thompson was taken to the hospital where he died from a .45 caliber bullet that had entered his lower back and exited from his upper left breast. Tests showed that he probably had been struck by a bullet coming through the closed passenger door

---

[2] An officer testified that it would be reasonable to expect bullet holes in Thompson's car if the gun were fired when the Cadillac was parallel and only 5 to 6 feet from the car. The officer also testified that there probably would not be bullet holes if the target of the shooting was at the front of the car. One witness placed Thompson at the front; two others testified that he was either coming toward the car or was in the street near the back of the car.

[3] None of the people in Thompson's group was a Blood. A witness explained that, if a fight goes on involving the Kirby Block Crips, the Crips might yell out the name of their own set "to let it be known that they are not punks [disrespected]."

of his car and then through the open driver's door as he crouched down by the sidewalk with his back to the open driver's door. Test results were inconclusive as to whether Thompson had fired a gun at the time of his death.

Defendant and McCallister each gave a different account of the night's events. McCallister also gave inconsistent statements and testimony. However, the essence of his story was that, when he and defendant left the convenience store, defendant was driving the Cadillac. They drove down Holman street, where Thompson stopped them and tried to hijack the car.[4] Thompson shot at them, nicking McCallister's finger and hitting defendant in the leg. Defendant and McCallister drove away, got guns and treated defendant's wound. They then left the Cadillac, taking defendant's brown Oldsmobile.[5] During that time, McCallister was contacted on a pager by a person who wanted to purchase marijuana. When McCallister and defendant were driving down Commercial Street to make the delivery, they saw Thompson. Thompson grabbed his gun and pointed it in McCallister's direction. McCallister grabbed his gun from his lap and shot the clip at Thompson while shouting to defendant, "Watch out, [defendant], he's going to shoot!" McCallister denied aiming the gun at Thompson, but stated that, if he had not killed Thompson, Thompson would have killed him. McCallister felt that his life was in danger. At trial, he said he did not recall whether Thompson fired his gun.

Defendant gave a taped statement to the police, which was played for the jury. His version of the events was that, after leaving the store, he and McCallister were going to defendant's girlfriend's house when they saw Thompson in the middle of the street. Thompson had a gun, and there was another assailant. Thompson walked to the passenger's side and started shooting. Defendant drove away and discovered that he had been hit. They went first to defendant's girlfriend's house and then to McCallister's house to get guns. They drove around "trying to see what happened" when they

---

[4] The Cadillac was equipped with gold Daytons, wire wheel covers on the tires that are a status symbol. Gold Daytons cost about $1,700, and people try to acquire them by force. One of the threats reported to defendant was that the Daytons would be stolen.

[5] The brown car, be it Buick or Oldsmobile, was not recovered.

saw Thompson and two other people in the street. Thompson went to his car and McCallister yelled, "He's going to shoot!" Defendant started shooting toward Thompson. Defendant said that he was not trying to kill anyone; he was just trying to survive. He was shooting wildly, out of fear.

Defendant first assigns error to the trial court's denial of his motion for discovery of any police officer's notes of oral statements made by witnesses during police interviews. ORS 135.815(1) provides:

"Except as otherwise provided in ORS 135.855 and 135.873, the district attorney shall disclose to the defendant the following material and information within the possession or control of the district attorney:

"(1) The names and addresses of persons whom the district attorney intends to call as witnesses at any stage of the trial, together with their relevant written or recorded statements or memoranda of any oral statements of such persons."

We have held that notes or rough drafts that are merely steps in the preparation of a statement do not come within ORS 135.815(1). *State v. Morrison*, 33 Or App 9, 575 P2d 988 (1978); *State v. Bray*, 31 Or App 47, 569 P2d 688 (1977). Defendant argues that those cases are no longer good authority in the light of *State v. Gallup*, 108 Or App 508, 816 P2d 669 (1991), and *State v. Fritz*, 72 Or App 409, 695 P2d 972, *rev den* 299 Or 313 (1985). In *Gallup*, we held that information that a district attorney had refused to disclose was not "work product," as had been claimed, and was, therefore, discoverable under ORS 135.815(1). In *Fritz*, we held that an officer's notes, made while interrogating the defendant, were subject to disclosure under ORS 135.815(2), which is identical to subsection (1) except that the memoranda of oral statements apply to defendants, not witnesses.

The state contends that *Fritz* is distinguishable, because it was decided under subsection (2), and that *Gallup* does not assist defendant, because there the trial court erred as a matter of law in ruling that the notes were work product when they were not. The state contends that *Gallup* does not support the proposition that, if a prosecutor develops a report based on the notes, the notes would have been within the statute, contrary to *Bray*.

■■ However, we need not decide the effect of our holdings in *Fritz* and *Gallup* on our earlier decisions.[6] The burden is on a defendant to show a reasonable good faith belief that the evidence sought is favorable to him and material to his defense. *State v. Koennecke*, 274 Or 169, 179, 545 P2d 127 (1976); *Armstrong*, 71 Or App at 467. Here, defendant argued that the notes were subject to discovery but made no offer of proof as to what the notes contained. He did not ask to have the notes sealed and included in the record, which would have permitted review. *See Gallup*, 108 Or App 511. Defendant has made no showing of prejudice by the state's failure to disclose the notes.

Defendant next assigns error to the court's failure to sustain his objection to the testimony by Dondra that Thompson told her that he only had one bullet left, and that Thompson told her he was not going to bring his gun into Hawkins' house.[7] Defendant argues that the testimony was hearsay and that the error was prejudicial. The state does not dispute the merits of defendant's hearsay argument, but

---

[6] We also need not decide, as urged by defendant, that his case is distinguishable from our cases approving non-disclosure of the notes made of a witness' statement when the substance of the notes is incorporated into a report. *See, e.g., State v. Armstrong*, 71 Or App 467, 692 P2d 699 (1984); *State v. Haynes*, 49 Or App 89, 619 P2d 889 (1980); *State v. Peters*, 39 Or App 109, 591 P2d 761 (1979); *State v. McKeen*, 33 Or App 343, 576 P2d 804 (1978); *State v. Warren*, 31 Or App 1121, 572 P2d 341 (1977).

[7] Dondra testified:

"[PROSECUTOR:] Did [Thompson] say there were any rounds left in the gun?

"[WITNESS:] He said there was one bullet left.

"* * * * *

"[PROSECUTOR:] Did you see, now, when he got here, parked his car, went into Seritta Hawkins' house, did you see what he did with that gun?

"[WITNESS:] No, I didn't.

"[PROSECUTOR:] Were you . . . when you went into the house, were you aware that he had the gun or didn't have the gun?

"[WITNESS:] I know that [Thompson] said that he was not going to take the gun into the house.

"* * * * *

"[WITNESS:] When I heard the gunshots being fired, I knew that it wasn't [Thompson] because [Thompson] said that he had one bullet left and it was more, obviously, it was more than one bullet being fired."

argues that admission of the evidence does not mean that defendant's conviction should be reversed.[8]

■■ Evidential error is not presumed to be prejudicial, OEC 103(1), and we will affirm the trial court, notwithstanding evidential error, if there is substantial and convincing evidence of guilt and little, if any, likelihood that the error affected the verdict. Or Const, Art VII (amended), § 3; *State v. Walton*, 311 Or 223, 809 P2d 81 (1991).

Defendant raised self-defense as a complete defense to the charge of homicide, and the court instructed on that defense. Defendant's claim was that he and McCallister reasonably believed that Thompson was about to use deadly physical force against them when Thompson saw them on Commercial Street, and that necessity demanded that they protect themselves in kind.

Defendant contends that, given the evidence, his claim of self-defense was not unreasonable. There was evidence that Thompson was the aggressor in the first encounter, that defendants did not then shoot at Thompson, and that Thompson was the aggressor in the encounter on Commercial Street. Kesha testified that Thompson "fired back" at least once during the Commercial Street encounter, and Ollison found the gun out of the car on the curb after the shooting.

Defendant contends that Dondra's testimony that Thompson's gun was in the car and only had one bullet was very damaging to his defense. He argues that, if the gun had been left in the car, Thompson could not have had it on him or in his hand when defendant and McCallister first caught sight of him on Commercial Street. Therefore, he argues, the jury would be less likely to believe his claim that Thompson had reached for his gun or had pointed it at defendant and McCallister.

The state contends that defendant's story was that, when he and McCallister came around the corner, Thompson

---

[8] The state is incorrect that defendant failed to preserve the claim of error because, during impeachment of Kesha Lawson, she admitted that she probably had told an investigator that Thompson had fired one shot because she had asked if there were any bullets left in the gun and there weren't any. Defendant clearly objected to the introduction of the hearsay testimony from Dondra.

was "just there," either at his car or in the street or running for his car. Therefore, even if Thompson had left his gun in the car, he would have had time to retrieve the gun and reload it before defendant saw him standing on the street. Also, the state argues, defendant was not shooting at Thompson because he saw Thompson with a gun but because defendant said McCallister had reported an imminent threat.

The state asserts that "the real reason that the jury rejected defendant's theory of self-defense is evident": The shooting was caused by a perceived "disrespect." The state argues that, irrespective of whether Thompson or defendant was the initial aggressor, the testimony at trial supports the conclusion that everyone involved in the first shoot-out knew that the next time these parties met, there would be more gunshots. The state contends that, for either person to back down would have resulted in being "disrespected," and that that result was intolerable to any of the persons involved. Thus, the state argues, whether Thompson's gun was empty or fully loaded, Thompson would have had no choice but to stand his ground when he saw defendant and McCallister, and that the "short statements" about Thompson's gun would not have affected the verdict.

The state's argument presents one theory that the jury could have considered. However, we cannot know if the jury rejected the defense on the reasoning suggested by the state, nor can we know what weight the jury gave to Dondra's testimony in reaching its decision. *See State v. Mendez*, 308 Or 9, 15, 774 P2d 1082 (1989).

■ ■ Defendant's theory of self-defense depended on whether it was reasonable for him to believe that Thompson was about to use deadly force. Even though there was evidence that Thompson shot a gun during the second encounter, the point at which Thompson had the gun was critical to defendant's assertion that he believed he had to react when McCallister shouted that Thompson was going to shoot. Dondra's testimony that Thompson did not bring the gun into Hawkins' house, because it only had one bullet left, made it more likely that Thompson had to retrieve the gun from the car and that, therefore, defendant did not react to a deadly force. It was error to admit Dondra's testimony, and we

cannot say that there was little likelihood that the evidence affected the jury's verdict. The case must be remanded.

■ Defendant has not challenged his conviction for unlawful use of a weapon, but assigns error to the trial court's failure to exclude his juvenile adjudication in his criminal history score. He acknowledges that we have decided that issue contrary to his position. *State v. Stewart,* 123 Or App 147, 859 P2d 545 (1993), *mod on other grounds* 126 Or App 456, 868 P2d 794 (1994). However, because defendant's manslaughter conviction is reversed, his conviction for unlawful use of a weapon must be remanded for resentencing. ORS 138.222(5).

Conviction for unlawful use of a weapon affirmed and remanded for resentencing; conviction for manslaughter reversed and remanded for a new trial.